**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**CRIMINAL ACTION NO. 05-40-JBC**

**UNITED STATES OF AMERICA, PLAINTIFF,**

**V.**

**MEMORANDUM OPINION AND ORDER**

**JOHNNY PENNINGTON,**
**TENA LYNN PENNINGTON, and**
**TERRY LEE MCKENZIE, DEFENDANTS.**

* * * * * * * * * * *

This matter is before the court on the defendant Johnny Pennington's ("Johnny") motion to exclude all evidence of statements made by his wife, defendant Tena Pennington ("Tena"), to police on January 22, 2005, or to order separate trials (DE 41) and on Johnny and Tena's motion to suppress and return all evidence and information seized from their home and business office and to suppress all statements made during the search under Rule 41 of the Federal Rules of Criminal Procedure (DE 42). A hearing was held before this court on January 27, 30, and 31, February 6, and April 14, 2006. The court, having reviewed the record and being otherwise sufficiently advised, will deny Johnny's motion to exclude or sever (DE 41) and deny Johnny and Tena's motion to suppress (DE 42).

The defendants have also moved to continue the trial of this matter, scheduled for July 31, 2006. The court will deny that motion (DE 82), as the defendants present no viable reason to depart from the schedule to which counsel have previously consented.

**FACTUAL BACKGROUND**

At 12:45 a.m. on January 22, 2005, Kentucky State Trooper Jason Gabbard submitted an application for a warrant to search Johnny Pennington's residence for "any firearms, weapons, and ammunitions," because, according to the boxes checked on the warrant application form, Trooper Gabbard believed there was probable and reasonable cause to suspect that such property constituted

- ✓ stolen or embezzled property;
- ✓ property or things used as means of committing a crime;
- ✓ property or things in possession of a person who intends to use it as a means of committing a crime;
- ✓ property or things in possession of a person to whom it was delivered for the purpose of concealing it or preventing its discovery and which is intended to be used as a means of committing a crime;
- ✓ property or things consisting of evidence which tends to show a crime has been committed or a particular person has committed a crime.

In support of the application, Trooper Gabbard submitted an affidavit, which states that (1) Johnny told Trooper Gabbard on December 30 or 31, 2004, that he had purchased a particular gun; (2) on January 20, 2005, Trooper Kenny Yarber was told that Johnny was a convicted felon and had bought a firearm at Stanton Sporting Goods; (3) Trooper Yarber obtained Johnny's criminal history report on January 21, 2005, which revealed that Johnny had been convicted of several felonies; (4) Johnny had told Officer Donovan Crabtree that he had just bought a 500-caliber firearm and already owned two others; (5) on January 21, 2005, Police Chief Kevin Neal and Sheriff Joe Martin went to Stanton Sporting Goods and

learned from the owner that Johnny had accompanied Rondal Reed to the store, and Rondal Reed had filled out the paperwork on the gun that was purchased at that time.

Although Trooper Gabbard ultimately signed the affidavit, Trooper Yarber typed the information contained in it. Troopers Yarber and Gabbard admitted that they had no reason to believe that they would find stolen goods at the Penningtons' home. Trooper Gabbard explained that they checked all of the boxes because doing so gave them broader authority to seize evidence in the event they did find property that fell within one of those categories.

Before Trooper Gabbard applied for the warrant, Trooper Yarber had called Commonwealth Attorney Darrell Herald, who assured him that the information in the affidavit constituted probable cause. Mr. Herald testified that he did not instruct them to search for anything other than firearms, ammunition, and weapons, and he did not recall having been told any specific reason to believe that the guns would be at Johnny's residence. State court Judge Kenny Proffitt signed the warrant and faxed it back to Trooper Gabbard around 1:00 a.m. on January 22, 2005. Troopers Yarber and Gabbard then realized that on the warrant itself, though not the affidavit, the name was inadvertently listed as Johnny Faulkner instead of Johnny Pennington.[1] The troopers corrected the error without seeking anyone's approval, and they and other officers proceeded to the Penningtons'

[1] The Penningtons' home address, accurately noted on the warrant, is 140 Faulkner Lane.

residence.

Thirteen officers arrived at the Pennington home at approximately 2:00 a.m. on January 22, 2005. Troopers Gabbard and Jim Perkins went to the front door. Trooper Perkins is 6'5" and weighs 275 pounds, and he has received significant tactical training through his service in the Marine Corps and the State Police; when he participates in a search, he is typically stationed at the door because of his stature. When no one answered their knock, Perkins looked through the window to the right of the front door, at which time he saw Johnny coming through the living room toward the front door carrying a firearm. Trooper Perkins and several other officers testified, and the court finds, that Trooper Perkins stated that Johnny had a gun, whereupon the officers drew their weapons. At that point, Trooper Perkins announced, "State Police," and Johnny put the gun down on top of the couch prior to answering the door.[2] The other officers replaced their weapons when Johnny

[2]Whether Perkins saw this occur is irrelevant to the resolution of the instant motions. The court makes these findings of fact: that Johnny was carrying a gun on his way to the door after hearing a knock; that Trooper Perkins saw him carrying it and so advised his colleagues, who drew their weapons; that Johnny placed it on the couch after hearing Perkins announce, "State Police;" and that Johnny arrived at the door unarmed, causing Perkins to share that fact with his colleagues, who then replaced their weapons. Having so found, the court deems it unnecessary to determine whether the couch was visible through the window. Tena says it was not; Perkins claims otherwise and that he saw Johnny place the weapon there. Even if Perkins were not credible on this point, however, that would not destroy his credibility as to other matters because it is a false issue and neither adds nor subtracts anything on the analysis of this issue. Whether it was visible through the window or not, the couch was a logical resting place for the gun between the point at which Perkins saw Johnny armed, and so warned his fellow officers, and the door, at which Johnny was not armed. Relying on all of the attendant circumstances, and finding Tena not credible, as will later be discussed, the court

came to the door unarmed.

Trooper Perkins informed Johnny of their purpose when Johnny answered the door, and Johnny told them he did not have anything illegal in the house and that they could go ahead and search. The government maintains that, after Johnny consented to the search, Trooper Perkins advised him that they had a warrant, and Trooper Gabbard read it to him. The Penningtons deny that Johnny consented to the search; Tena testified that she heard them reading the warrant, but she did not hear any discussion before that. Johnny was not initially handcuffed, but he was read his *Miranda*[3] rights and invoked his right to counsel.

Trooper Yarber stated that he retrieved a loaded pistol and five bullets from a couch inside the house to the right of the front door. Trooper Yarber could not recall whether Trooper Perkins had told him to look on the couch or whether he went there instinctively, but he did state that the couch "was the only logical place he could have hid the gun as he walked through, because it was halfway between his bedroom and the door." Tr. of Hr'g 1/27/06, p. 65. Tena claims that she had placed the gun there earlier that night, because she always places the gun there when one of her grandchildren is spending the night; she testified that Johnny did not even know the gun was there, and she stated that she led Trooper Yarber to

---

finds, as a matter of fact, that whether Perkins saw him do so or not, Johnny placed the gun on the couch.

[3] *Miranda v. Arizona,* 384 U.S. 436 (1996)

the gun.[4] As will be explained later in this opinion, the court rejects Tena's testimony on this point.

Trooper Brinton Rollins immediately searched the garage, kitchen, and two upstairs rooms for other people; another officer secured the rest of the home at that time. Trooper Rollins estimated that the initial protective sweep took five minutes. Trooper Rollins also attempted to contact ATF agent Brad Brashear between 2:00 and 4:00 a.m., but was unable to reach him.

Tena showed the officers the safes and other locations in which the firearms were stored. The government contends that Tena said some of the guns were Johnny's, but she does not recall having said that. According to Tena, the search was exhaustive. She testified and stated in her affidavit that the officers searched Johnny's briefcase and examined the documents inside it; threatened to bring in canine units to assist in the search; opened prescription medicine bottles and counted the pills they contained; carefully checked the files and information on their computer; looked inside her purses, wallets, decorative ceramic figurines, teacups, flowerpots, coat pockets, and shoes; and checked underneath rugs. Tena also claimed in her affidavit that she could hear officers playing pool in the basement while she was being questioned in the office, but testified at the hearing only that she heard the clicking of pool balls; none of the officers saw anyone playing pool. The officers also testified that they never saw anyone other than Tena use the

---

[4]See footnote 2, *supra.*

computer.[5]

Johnny was arrested and taken to jail approximately one hour and fifteen minutes after the search started. A little while before that time, Trooper Yarber called Sergeant Jim Bowling to inform him that they had discovered and photographed numerous firearms and approximately $500,000 in cash. Sergeant J. Bowling arrived at the Pennington home around 3:00 a.m.; he instructed Trooper Rollins to videotape the evidence and where it had been found. The video documents the layout of the Penningtons' home, and the tape includes footage of various prescription pill bottles and of Trooper Rollins reading the labels onto the video.

Sergeant J. Bowling called his brother, Sergeant Brian Bowling, shortly after he arrived, and Sergeant B. Bowling came to the scene between 4:30 and 5:00 a.m. Sergeant J. Bowling testified that he read her *Miranda* rights to Tena and asked her why they had such a large amount of cash in the home. Sergeants J. and B. Bowling subsequently interrogated Tena together. They did not read her *Miranda* rights to her after Sergeant B. Bowling arrived, but he stated that he knew she had been advised of those rights, was willing to talk, and was not under arrest. Tena denied ever having been advised of her *Miranda* rights. Tena testified that she did not feel free to move about her home; for example, she claims that she was not allowed to turn off the light and close the door to her bedroom, where her six-year-

[5] Trooper Perkins testified that Tena turned on the computer to make a copy of the log of seized evidence.

old grandson was asleep throughout the search. Tena testified that she was terrified during the search, and she was visibly emotional during her testimony.

Sergeant J. Bowling testified that he made the decision to seize the cash, because he did not believe Tena's explanation was sufficient; Sergeant B. Bowling agreed that her explanation was inadequate, and he stated that although the Sergeants had authority to decide whether to seize the money, the general consensus among the officers was that they should do so. Several of the officers stated that it was their official policy to seize cash over $10,000 if the suspect could not proffer a reasonable explanation for having it on hand. At the hearing, Tena said she could not remember what reason she gave the officers for having so much cash at home. The officers testified that she told them (1) that the money was kept on hand for her grandchildren, because she did not trust banks, or in case they filed for bankruptcy; (2) that some of it had been withdrawn to purchase a $60,000 piece of equipment and that they liked to make such purchases in cash for tax purposes; and (3) that she and Johnny obtained the money from a couple of businesses they owned, bank withdrawals – which (according to Tena) were always under $10,000 to avoid additional paperwork – and rental income from excavating equipment. Sergeant J. Bowling testified that a significant amount of money, approximately $75,000, at least, was banded and stamped with dates in January 2005, meaning that it had apparently been withdrawn within the three weeks preceding the search. Based on his perception that her explanation was

inadequate and his knowledge that Johnny had previously been convicted of fraud, Sergeant J. Bowling believed seizing the money was justified, and his post commander advised him to do so.

Sergeant B. Bowling participated in a second search of the residence that did not yield any evidence. Sergeant B. Bowling also suggested that they contact the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and Sergeant J. Bowling called ATF Agent Shawn Morman between 4:00 and 5:00 a.m. while the evidence was being logged. Agent Morman told Sergeant J. Bowling that he would get back to him; no ATF or other federal agents were present at the Penningtons' house at any point that night.

Subsequent to the search of the Penningtons' home and based on the evidence discovered during that search, the officers obtained a warrant to search Johnny's business for any firearms, weapons, ammunition, and currency. No evidence was seized during that search.

Johnny was charged in state court with possession of a firearm by a convicted felon. During the pendency of that charge, Johnny filed a motion for return of the cash and silver bars, which was granted by Judge Proffitt on February 22, 2005. The cash and silver bars were returned to the Penningtons, minus $189,988.81 transferred to the Internal Revenue Service pursuant to a levy for back taxes. Johnny was initially indicted in federal court on weapons charges on March 4, 2005, and a superseding indictment was filed naming Johnny and Tena

on June 2, 2005. The state charges were dismissed on July 20, 2005.

**LEGAL ANALYSIS**

**I. Johnny's Motion to Exclude Tena's Statements**

The Motion to Exclude is based on Johnny's right to confrontation. In its response to the Motion to Exclude, the government concedes that police testimony regarding Tena's statements that Johnny owned some of the firearms in the house would violate Johnny's right to confrontation. The government also states that it will not elicit police testimony regarding her other statements, because they are irrelevant. In his reply to the government's response, Johnny clarifies that he also seeks to preclude use of her statements for impeachment or any other purpose at trial, because, as they argue in their Motion to Suppress, her statements were involuntary.

"Testimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington,* 541 U.S. 36, 59 (2004). However, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 59 n.9. "The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* (*citing Tennessee v. Street,* 471 U.S. 409, 414 (1985)). The Court in *Street* held that where a sheriff testified about statements the defendant made in

confessing his guilt to rebut the defendant's claim that the confession had been coerced, the Confrontation Clause was not implicated, because the statements – which were not admitted for the truth of their content but to demonstrate what occurred during the interview – were nonhearsay.

Johnny recognizes the potential that Tena's statements to the police during the search of her residence may come in for nonhearsay purposes and that "the exclusion of reliable and probative evidence for *all* purposes" is required "only when [the evidence] is derived from involuntary statements." *Michigan v. Harvey,* 494 U.S. 344, 351 (1990) (*citing New Jersey v. Portash,* 440 U.S. 450, 459 (1979) (compelled incriminating statements inadmissible for impeachment purposes); *Mincey v. Arizona,* 437 U.S. 385, 398 (1978) (same)).

If a confession is given during the course of "custodial interrogation," the statements are admissible only if the suspect was advised of her rights under *Miranda,* 384 U.S. 436. *Stansbury v. California,* 511 U.S. 318, 322 (1994). The Penningtons argue that Tena was in custody when she made statements regarding ownership of the gun and was not advised of her *Miranda* rights. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in a significant way." *Miranda,* 384 U.S. at 444. Courts analyze the totality of the circumstances and make an objective determination of "how a reasonable [person] in the suspect's position would have understood the situation," to decide whether

an individual was in custody when statements were made. *United States v. Phillip,* 948 F.2d 241, 247 (6th Cir. 1991) (*citing Berkemer v. McCarty,* 468 U.S. 420, 442 (1984)). Whether a reasonable person would have felt free to leave is a consideration. *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir. 1998). In determining whether a confessor was in custody, courts also consider factors such as

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo,* 133 F.3d at 950. Questioning which occurs in the suspect's residence is less likely to be deemed custodial than questioning at the police station. *United States v. Protsman,* 74 Fed. Appx. 529, 533 n.6 (6th Cir. 2003).

The court finds that Tena was not in custody when she answered the officers' questions during the search, because a reasonable person in the same situation would not have felt compelled to respond. Any subjective perception by Tena that she was not free to leave or by any of the officers that she might not have been free to leave is irrelevant to the objective inquiry. The questioning occurred inside the Penningtons' home, and at that time the officers neither had nor

expressed any reason to suspect Tena of illegal activity. The discourse between Tena and the officers was cordial; Tena assisted them in locating the contraband, and she offered coffee to them. There is no evidence that Tena hesitated to respond to the officers' inquiries; the fact that none of the officers questioned Johnny after he invoked his right to counsel supports the finding that they would not have continued to question Tena if she had not submitted voluntarily to their interrogation. Tena's assertions that she had to ask permission to go to the bathroom and was denied her request to turn out the light in the bedroom where her grandson was sleeping, even if true, do not support a finding that she was in custody; she had no reason to believe that she could not have left the house. The duration of the search and the repeated instances of questioning do weigh in favor of imposing the *Miranda* requirement, but those factors are balanced by the fact that, approximately one hour into the search, Johnny was actually arrested, taken into custody, and removed from the home and taken to the police station. By comparison, a reasonable person in Tena's situation would have known that she was not likewise in custody.

Because Tena was not in custody during her interrogation, the court declines to make a finding whether the officers advised her of her rights under *Miranda*, and the court's analysis shifts to whether Tena's statements were voluntarily made. The voluntariness of a confession is determined with respect to the totality of the circumstances. *United States v. Weekley,* 130 F.3d 747, 751 (6th Cir. 1997)

(*citing Medieros v. Shimoda,* 889 F.2d 819, 824 (9th Cir. 1989)). "If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced." *Townsend v. Sain,* 372 U.S. 293, 307 (1963). The government must prove by a preponderance of the evidence that the confession was voluntary. *United States v. Bennett,* 27 Fed. Appx. 431, 435 (6th Cir. 2001). In assessing the voluntariness of the statements, courts consider such factors as

> the age of the accused, [her] level of education or intelligence, [her] physical condition and emotional state at the time of the confession, [her] expressed fears of violent reprisals, actual physical punishment, the proximity of the confession to a violent arrest and the inherent coerciveness of the setting in which the confession was given.

*United States v. Murphy,* 763 F.2d 202, 205 (6th Cir. 1985).

The court finds that Tena's statements were made voluntarily. Although Tena testified at the suppression hearing that she was terrified during the search, the facts elicited at the hearing indicate otherwise. Tena was cooperative and hospitable during the search, which undermines her claim as to how severely the officers' presence and behavior affected her emotionally. The fact that the interrogation occurred in her home made the circumstances less intimidating than they otherwise might have been. Tena had no reason to fear violent or physical consequences if she refused to answer questions; she was able to see that Johnny, who was ultimately arrested, was not restrained or questioned for the first part of the search and that he was taken peacefully to Trooper Perkins's police car to be

taken to the police station. Tena was mature and intelligent enough to make and did make the decision to volunteer the information requested by the officers.

Because Tena's statements were not made involuntarily or in violation of *Miranda,* the court finds that they are admissible (subject to the *Crawford* considerations) and will not suppress them at a joint trial.

**II. Johnny's Motion to Sever**

As an alternative to the exclusion of Tena's statements, Johnny requests separate trials. "If the joinder of ... defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant ... the court may ... sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). A defendant moving for severance bears a heavy burden of demonstrating prejudice from joinder. *United States v. Davis,* 809 F.2d 1194, 1207 (6th Cir. 1987); *United States v. Parnell,* 581 F.2d 1374, 1382 (8th Cir. 1978).

Tena's statements are admissible against Johnny for their truth only if Tena testifies.[6] The Supreme Court has held that "where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." *Nelson v. O'Neil,* 402 U.S. 622, 629-30 (1971);

---

[6] Tena's statements are admissible for non-hearsay uses regardless of whether she testifies.

*see also United States v. Chapman,* 501 F. Supp. 704, 705 (S.D. Ohio 1980) (ability to cross-examine codefendant as to incriminating statements eliminates prejudice). Johnny has not shown that his defense would be prejudiced by a joint trial, and the court will therefore deny the motion to sever.

**III. Joint Motion to Suppress**

In the Penningtons' Motion to Suppress, they argue that the search warrants were not supported by probable cause; the search warrant applications contained false assertions; the officers engaged in various acts of misconduct in pursuing the search; no warrant exception applies to justify the search; and Tena's statements were not made voluntarily. The Penningtons urge the court to exclude all of the evidence obtained during the search and, consequently, to dismiss the indictment.

In its response, the government raises several arguments. First, the government contends that the warrant to search the Penningtons' house was supported by probable cause. Second, the government argues that, even if the warrant was flawed, the search was nonetheless valid under the good-faith exception to the warrant requirement. Third, the government claims that the search would have been valid even without a warrant, because Johnny consented to the search before he learned that the police had a warrant and because the evidence would inevitably have been discovered during a valid protective sweep following Johnny's arrest or pursuant to the plain-view exception. Fourth, the government claims that the officers did not engage in any misconduct. Finally, the

government contends that Tena's statements were voluntarily made.

A. Seizure of $562,000 Cash

The defendants argue that the police officers' decision to seize $562,000 cash and two silver bars indicates that they considered and treated the search warrant as a general warrant. The court believes it is important to establish at the outset of its discussion that the seizure of currency and silver bars is irrelevant to any discussion pertaining to the validity or execution of the warrant, because they were not seized pursuant to the warrant's authority.

At the hearing, the officers admitted that the descriptive language on the warrant itself did not authorize them to seize U.S. currency or precious metals. The record is clear that the Sergeants were consulted and made the decision to seize the money, and that they did so based on the large quantity. Trooper Perkins testified that the decision whether to seize money is dependent on the amount, and that, based on their training, they seize large sums and return it if the owner can prove legal possession. Trooper Gabbard confirmed that, in accordance with their training, they were required to contact a supervisor if they found over $10,000 cash, and the supervisor would advise them whether to take it. The troopers who initiated the search in fact called their supervisor, Sergeant J. Bowling, and informed him that they had found a significant amount of cash, and Sergeant J. Bowling came to the scene. Consistent with the policy cited by the troopers, Sergeants J. and B. Bowling asked Tena about the origin of and purpose for the

money, and they made the decision to seize the cash because they did not consider Tena's explanation to be credible. Also consistent with the troopers' testimony, Sergeant B. Bowling stated that he did consider that the money may have to be returned to the Penningtons in the future.

The court finds credible the officers' unrefuted[7] testimony about the reasons Tena gave when they asked her why the Penningtons had such a large amount of money in the home. These reasons implied a desire to protect cash from bankruptcy proceedings and to evade reporting requirements in dealings with banks. The officers were within their rights to reject such reasons because they revealed illegal purposes. Moreover, from another reason – that large business purchases were made in cash for tax purposes – the officers could have inferred either that Tena was lying, as businesses want records of such purposes, or that her statement evinced a desire to avoid tax obligations.

The currency and silver seized by the officers from the Penningtons' residence was not taken under the impression that the warrant granted them authority to seize it. Rather, the officers followed a procedure learned in their training, by which the discovery of currency in amounts greater than $10,000 is reported to a superior officer, who discerns whether the suspect can provide a credible and legal explanation for possessing the large sum of money; if the superior

---

[7] Tena did not deny making the statements attributed to her regarding reasons for the large sum of cash in the residence. She merely claimed a lack of recall on this point.

officer is not satisfied with the justification, he can authorize seizure of the currency pending verification that it was obtained legally and possessed for a legal purpose. Therefore, the court will not consider the seizure of currency and silver in its analysis of the issues to which the warrant is pertinent – probable cause, good-faith reliance, and excessive scope of a search beyond the warrant.

B. Tena's Credibility

Several aspects of Tena's testimony cast doubt upon her veracity. Tena exaggerated in her affidavit that the officers examined the computer for one to two hours; even accepting the defendants' own expert's proffered testimony as true, the computer was actively used for a period of only approximately fifteen minutes. She also exaggerated I the affidavit that "[s]everal officers played pool in the basement while other officers were searching the house," contrasted with her more restrained suppression-hearing testimony that "[y]ou could hear the pool balls" during the search. Tr. Of Hr'g 1/31/06, p. 59.

Tena's memory as to specific detail, moreover, is selective. She was able to recount in her affidavit specific questions the officers asked her during the search and testified at the hearing that she specifically recalled that Johnny did not consent to the search; however, Tena claimed at the hearing that she could not remember any of the answers she gave the officers regarding why they kept such large amounts of cash at home.

In addition to exaggeration and selective memory, the court specifically

declines to credit Tena's testimony that she was not aware that she and/or Johnny owed any back taxes. In fact, before the night of the search here at issue, Tena had conceded liability for $70,000 in taxes owed in November 2000, and she had had several meetings and had received multiple notices from the Internal Revenue Service regarding her tax liability.

Most significantly, the court finds that Tena's account of why a gun was on the couch was fabricated in an attempt to persuade the court that Johnny was not carrying the firearm. Tena claimed at the hearing that she had placed the firearm in the couch cushions without Johnny's knowledge, and that she always did so when one of her grandchildren was staying at the house with them. The court cannot accept Tena's proposition that she put the gun behind the couch *when her grandchildren were present* as a safety precaution; placing a loaded firearm between couch cushions when young children are present is contrary to any conceivable notion of safety, and Tena's explanation for the gun's presence there is not credible. Given these intuitive indications of untruthfulness and the fact that crediting Tena's testimony would require the court to disbelieve the consistent and credible testimony of each officer who testified that Trooper Perkins saw Johnny with the gun and promptly alerted his fellow officers accordingly, the court finds that Tena testified falsely on this point and that Johnny had the gun in his possession when he began his walk toward the door after the officers knocked on it. The court further declines to find whether the couch upon which Johnny placed

the gun, after hearing that law enforcement officers were at the door, was visible from the front of the house. Instead, the court accepts the inference that he must have placed it there, based upon Perkins's observation of Johnny with the gun, so warning his fellow officers, who then drew their own weapons, and then advising them when Johnny arrived at the door that he had no gun, whereupon they holstered their weapons, and further based upon the couch's physical relationship between the bedroom from which Johnny emerged upon hearing the knock and the front door at which he arrived.[8]

Based upon the foregoing discussion, the court finds that Tena is not credible and accords little weight, if any, to her testimony.

C. Validity of the Warrant

A valid warrant must be based on probable cause established in an affidavit. U.S. Const. amend. IV. Probable cause exists where, from a common-sense approach, "given all the circumstances set forth in the affidavit, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The issuing judge or magistrate 'may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found' and is 'entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" *United States v.*

[8] See also footnote 2, *supra*.

*Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (*quoting United States v. Lawson*, 999 F.2d 985, 987 (6th Cir. 1993)).

A reviewing court does not make an independent probable-cause determination but simply "ensure[s] that the [issuing officer] had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39. The issuing officer's decision is entitled to great deference. *Caicedo*, 85 F.3d at 1192. Review of a probable-cause determination considers the totality of the circumstances. *Id.* at 1192-93. Only the information contained within the four corners of the affidavit and therefore known to the magistrate may be considered. *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005).

*1. False Statements on Warrant Application*

A hearing must be held to determine the validity of an executed search warrant if the defendant makes a substantial preliminary showing that the affidavit contained knowingly or recklessly made false statements that were necessary to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The warrant may be voided if, at the hearing, the defendant proves that the falsity was made with knowledge or recklessness and, if the false statements are set aside, the remainder of the affidavit is insufficient to establish probable cause. *Id.* If the executed warrant is voided, the fruits of the search are inadmissible. *Id.* at 156. However, if "the affidavit contains sufficient probable cause even when the allegedly false statements are set aside," the court need not even hold a hearing,

and the warrant will be upheld. *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001).

The defendants contend that Trooper Gabbard did not have a factual basis for his assertions that he had probable cause to believe that the items sought in the search were stolen or embezzled, were intended to be used for a crime, or had been delivered to Johnny to conceal them or prevent their discovery. There is no dispute that the police had no reason to suspect that the evidence sought was stolen or embezzled or that the only facts that were intended to support the request for the warrant were contained in the affidavit.[9] They did expect, at least, to find property or things used as a means of committing a crime, in that Johnny was a convicted felon, and possession of the firearms which they expected to discover would constitute a crime.

The court finds that none of the boxes were checked with knowledge that the assertions represented by them were false. Several officers believed that the boxes represented the types of evidence they could seize in the event it was discovered; they did not understand that the facts supporting probable cause had to exist prior to the search. Some of the statements were, however, recklessly made,

---

[9] They did know about Deputy Sheriff Danny McCormick's conversation with Johnny, through which Deputy Sheriff McCormick learned that Johnny had purchased a rare firearm, and that Deputy Sheriff McCormick had seen the weapon in Johnny's residence. However, the court has already recognized that, because that information was not known to the issuing judge, it cannot consider that discussion in assessing the validity of the warrant, and the government has not relied on that discussion to support a finding of probable cause.

as evidenced by Trooper Yarber's testimony that he did not think about their content and "just checked them."

While the court cannot and does not condone police officers' failing to understand the process of applying for a warrant, the court does not find that any of the false statements render the warrant void. The defendants do not dispute that the officers had a factual basis for the assertion that they expected to find property that had been used as a means of committing a crime. Even assuming that all of the other checked statements are false and were made with reckless disregard for their truth, setting them aside does not affect the probable-cause determination.[10] To the extent that the officers omitted information, the court finds that the information not included in the affidavit tended to support the finding of probable cause, and its omission does not affect the validity of the warrant. *See id.* at 506-07 (omissions immaterial unless they would negate probable cause).

*2. Correction of Name on Warrant*

Because only a judicial officer may issue a warrant, only a judicial officer may correct or alter a warrant, and alteration by a law enforcement officer is an improper attempt to exercise the judicial power. *United States v. Tran*, 2006 WL 20545, at *7 (6th Cir. Jan. 5, 2006). The officer executing the warrant in *Tran* changed the number 937 in the street address to be searched to 931 upon discovering the typographical error after the warrant had been issued. *Id.* at *5.

---

[10] The court will address below the impact of the lack of a nexus between the evidence sought and the premises to be searched.

Although the correction was improper, the court nonetheless declined to hold the warrant invalid, because there was no indication of bad faith, deception, or prejudice, and the alteration did not affect the existence of probable cause. *Id.* at *7.

Similarly, the court finds that Trooper Yarber's alteration of the warrant to change the name "Johnny Faulkner" to "Johnny Pennington" does not render the entire warrant invalid. The mistake was unintentional; it appears to have occurred because Johnny Pennington's residence was located on Faulkner Lane. The residence to be searched was otherwise sufficiently described by the street address, and the correct designation was made on the affidavit that accompanied the warrant application. The change was not prejudicial.

*3. Probable Cause*

An affidavit in support of a search warrant must demonstrate a "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998). The issuing judge need not, however, rule out all other possible locations. *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986). The Sixth Circuit and other courts have upheld a probable-cause determination even in the absence of direct evidence establishing such a nexus. *United States v. Newton,* 389 F.3d 631, 636 (6th Cir. 2004) (vacated and remanded on other grounds) ("probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a

drug dealer with continual and ongoing operations"); *Graham*, 275 F.3d at 503 (durable nature of firearms and forty-five-page affidavit detailing nature of ongoing conspiracy made it reasonable to infer that evidence would be at suspect's home); *Caicedo*, 85 F.3d at 1193 (affiant officer's experience that drug traffickers conduct their activities out of their homes supported probable-cause determination); *United States v. Jones*, 994 F.2d 1051 (3d Cir. 1993) (probable cause existed where two informants stated that stolen property and property purchased with stolen money were located at defendants' houses); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (magistrate judge could reasonably infer that unregistered silencer and gun would be found in defendant's residence); *United States v. Lamon*, 930 F.2d 1183, 1190 (7th Cir. 1991) (evidence from prior search plus officer's experience that drug dealers frequently keep incriminating items at a residence from which they do not conduct their trafficking activities supported probable-cause finding); *Shomo*, 786 F.2d 981 (10th Cir. 1986) (probable cause established where informant observed defendant leaving his residence with revolver in his possession).

The Sixth Circuit has also declined to find that probable cause existed in some situations in which there was no direct evidence linking the evidence sought to the location to be searched. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (facts that marijuana was growing near residence and road connected residence to plants were insufficient to establish nexus); *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998) (affidavit was insufficient

where it described premises, identified items to be seized, and described counterfeiting scheme operated by defendant, but did not indicate why evidence was believed to be located at premises); *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (probable cause lacking to search bank deposit box where there was no connection between bank and criminal activity, bank employees did not report any relevant illegal activities, and only connection was officer's experience that evidence of drug distribution is often maintained in deposit boxes). Although it is established that an officer's training and experience is one consideration in determining whether probable cause exists, "it cannot substitute for the lack of evidentiary nexus" between the criminal activity and the place to be searched where the officer has only a guess that the evidence will be found there. *Schultz,* 14 F.3d at 1097-98.

Based upon the holdings and reasoning in *Carpenter*, *Van Shutters*, and *Schultz*, the court finds that the warrant in this case was not supported by probable cause. There is little evidence to support the inference that Johnny kept his firearms at his residence. There was no attempt to determine whether Johnny maintained other residences or businesses at which his firearms might be stored. No one observed Johnny in possession of a firearm anywhere, much less at or near his residence. The court need not determine, however, whether there was a substantial basis for Judge Profitt's conclusion that probable cause existed, because the court finds that, even if the warrant was not supported by probable

cause, the officers executed the search in good-faith reliance on the warrant.

*4. Good-Faith Reliance*

An exception to the warrant requirement exists where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984). The Court explained that the exclusionary rule that accompanies Fourth Amendment violations is intended to deter misconduct by law enforcement officers or to encourage modifications to their departmental policies. *Id.* at 918. Because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment," exclusion of evidence seized by a law enforcement officer who relied on the magistrate judge's determination in objective good faith would not serve the deterrent purpose. *Id.* at 920-21.

The Sixth Circuit has not determined whether information that would have established probable cause and that was known to the officers but was not presented to the issuing judge is relevant to the good-faith analysis. *Carpenter,* 360 F.3d at 596. Troopers Yarber and Gabbard knew, but did not inform Judge Profitt, that Deputy Sheriff McCormick saw Johnny in possession of a firearm that he kept at his residence. That information, if it could be considered by the court, would provide the missing nexus between the crime and the place to be searched and would be conclusive on the issue of the officers' good faith. However,

because the court finds that the information actually presented to the issuing judge is sufficient to allow the officers to infer the nexus, the court will not consider Deputy Sheriff McCormick's observation and declines to address the propriety of considering it in determining good-faith reliance.

The Court in *Leon* cautioned that exclusion would nonetheless be appropriate where the officer had "no reasonable grounds for believing that the warrant was properly issued." *Leon,* 468 U.S. at 922-23. The Court thus carved out four departures from the good-faith exception, finding that suppression would be necessary where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the officer knew was false or would have known was false except for his reckless disregard of the truth," (2) "the issuing magistrate wholly abandoned his judicial role," (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant was "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." *Id.* at 924 (internal quotations and citations omitted).

The court finds that Judge Profitt was not so misled by any false information contained on the affidavit as to render the entire warrant invalid. As the court discussed above, the checked boxes do not affect the outcome of the probable-cause analysis, and they are similarly of no consequence to the good-faith reliance

issue.

The "so lacking in indicia" test employed in the good-faith analysis demands less support than the "substantial basis" test applied to probable-cause determinations. *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004). The court in *Washington* assumed without deciding that the warrant was not supported by probable cause. *Id.* at 240. The court found, however, that the affidavit was not "so lacking in indicia of probable cause" to render the officer's reliance on the warrant authorizing a search of the suspect's residence objectively unreasonable. *Id.* at 242-43. The affidavit reflected that the officer saw two drug deals conducted out of a particular car, the car was registered to an address from which the suspect was seen exiting, and the suspect had told a confidential informant that the car belonged to him. *Id.* Although the affidavit did not establish a sufficient nexus between the criminal activity and the premises to be searched to establish probable cause, the nexus was sufficient that the officer could rely on the warrant. *Id.*

In another Sixth Circuit case, the Court found that the facts that marijuana was growing near a residence and that a path connected the residence to the marijuana field were inadequate to establish probable cause. *Carpenter*, 360 F.3d at 594-95. The Court concluded, however, that the affidavit was not completely devoid of the required nexus between the criminal activity and the premises. *Id.* at 595-96. The statements, from which a connection could be inferred, were not so

vague as to be conclusory or meaningless, and the search was therefore valid pursuant to the good-faith exception to the warrant requirement. *Id.* at 596.

The Sixth Circuit has also found the exception to apply where, although an affidavit does not indicate why the officer believes the evidence would be located at the suspect's residence, the affidavit identified the premises to be searched and the items expected to be discovered, the affiant was experienced and explained his experience in the affidavit, and the same officer both wrote the affidavit and executed the search. *Van Shutters*, 163 F.3d 331. Although the absence of an explanation for the suspicion that evidence would be found at the residence precluded a finding that probable cause existed, the court found that the affidavit was not "so lacking" that it could not apply the good-faith exception. *Id.* at 338.

In *Schultz*, a warrant was issued to search a safe deposit box owned by the defendant. 14 F.3d at 1096. The Sixth Circuit found that there was probable cause to believe the suspect had committed a crime but that the officer had not made a "material connection" between the bank and any criminal activity beyond his suspicion based on training and experience. *Id.* at 1097-98. Despite the absence of the necessary nexus, the court upheld the search under the good-faith exception because the officer had probable cause to believe a crime had been committed, the connection was not unreasonably remote, there was no evidence of bad faith or perjury by the officer, and the warrant was issued by a proper judicial officer who had not abandoned his judicial role.

The warrant in *United States v. Laughton* did not make any connection between the premises to be searched and alleged criminal activity, between the defendant and the premises to be searched, *or* between the defendant and the criminal activity that was the subject of the investigation. 409 F.3d 744, 747 (6th Cir. 2005). The affidavit stated that a confidential informant made multiple purchases of controlled substances, but it did not specify from whom. *Id.* at 751. The affidavit further claimed that the confidential informant saw controlled substances at the suspect's home, but it did not detail when the observation was made or where the suspect's home was. *Id.* The affidavit merely listed the address to be searched without further elaboration. *Id.* The affidavit also summarized the affiant's professional experience. *Id.* After considering *Washington*, *Carpenter*, *Van Shutters*, and *Schultz*, the Sixth Circuit concluded that the good-faith exception was inapplicable under those circumstances, "because, in each of the cases cited, unlike the case at hand, our review turned up some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *Id.* at 749. In contrast, "[n]o reasonable officer could have believed that the affidavit in *Laughton* was not so lacking in indicia of probable cause as to be reliable." *Id.* at 751.

The court finds that there was at least a modicum of evidence to support the officers' belief that the warrant was validly issued. Even though the affidavit did not explicitly state a connection – based on either observation or on training and

experience – between the criminal activity being investigated and the premises to be searched, based upon the nature of the crime alleged, the officers could have reasonably inferred that the required nexus existed. *See Newton,* 389 F.3d at 636 (inferred nexus between residence and drug trafficking paraphernalia); *Graham,* 275 F.3d at 503 (same); *Caicedo*, 85 F.3d at 1193 (same); *Lamon*, 930 F.2d at 1190 (same); *Anderson*, 851 F.2d at 729 (inferred nexus between gun and silencer and residence).

Considering *Washington*, *Carpenter*, *Van Shutters*, and *Schultz*, the court finds that the affidavit is not "so lacking in indicia of probable cause" to render the officers' reliance upon it unreasonable. The affidavit made clear that Johnny owned firearms, it provided the dates on which the relevant information was learned, and it identified the premises to be searched as Johnny's residence. Furthermore, the fact that the affidavit was based entirely upon information personally learned by the affiant and information conveyed to him by fellow police officers[11] underscores its reliability.

Because the officers executing the search did so in good-faith reliance on the warrant signed by Judge Proffitt, the court finds that the search was valid.

C. Consent

The government contends that, even if the warrant was invalid and was not relied upon in good faith in conducting the search, the search is nonetheless valid

[11] It bears emphasizing again that this court does not include Deputy Sheriff McCormick as one of those police officers, in this good-faith analysis.

because Johnny gave consent before Trooper Perkins read the warrant to him. Fourth Amendment rights may be waived by free and voluntary consent. *Davis v. United States*, 328 U.S. 582, 593-94 (1946). A statement manifesting consent must be voluntary, unequivocal, specific, intelligent, and uninfluenced by duress or coercion. *United States v. Worley*, 193 F.3d 380, 385-86 (6th Cir. 1999) (*citing United States v. Scott,* 578 F.2d 1186, 1188-89 (6th Cir. 1978); *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)). The validity of consent is determined under the totality of the circumstances. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). In analyzing consent, courts consider factors such as the suspect's age, intelligence and education, and understanding of his constitutional rights, including the right to refuse consent; the nature and length of the detention; and any coercive conduct by the police. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). In addition, "[n]ighttime searches are deemed to be more intrusive than daytime searches, and the assemblage of law enforcement officers at one's door in the middle of the night has a tendency to be more coercive than during the day." *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 n.8 (11th Cir. 2002); *see also Harless v. Turner*, 456 F.2d 1337, 1338-39 (10th Cir. 1972) (no consent where four or five officers entered the defendant's home at 1:45 a.m., roused him from bed, and allegedly gained consent to search). *See also United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996) (time of day considered in voluntariness of consent in traffic stop context); *United States v.*

*Randolph*, 789 F. Supp. 407, 409 (D.D.C. 1992) (time of day a factor in whether bus passenger's consent to search was voluntary). Whether the suspect assisted the authorities conducting the search is also relevant. *Worley*, 193 F.3d at 386. What the officer might have done if consent had not been given is irrelevant. *Carter*, 378 F.3d at 589.

"It is the government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained." *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (*quoting Riascos-Suarez*, 73 F.3d at 625. In this case, thirteen uniformed officers initially executed the search warrant, and they arrived at Johnny's home at approximately 2:00 a.m. The court finds that Johnny started toward the door carrying a gun, but he put it down when he realized the police were at the door; Tena's testimony that she had put the gun behind the couch cushions is not credible. The officers testified that, upon learning that they believed he illegally possessed firearms, Johnny told them they could search if they wanted to do so; they did not specifically ask for consent to search. The court finds unpersuasive Tena's claim that she did not hear the conversation. Her suggestion that Johnny did not consent to the search is contradicted by the officers' testimony and by the subsequent actions of Johnny, Tena, and the officers. After the officers read the search warrant, Johnny invoked his right to counsel. Johnny's prior felony convictions had made him familiar with the criminal justice system. Johnny's invocation of his right to counsel and his experience with

the legal system indicate that he was aware that he did not have to consent to the search. During the search, Tena showed the officers where the firearms were located throughout the house. While recognizing that her assistance was rendered after the warrant had been read, the court finds that she knew of Johnny's consent and that her cooperation, particularly in light of the fact that she did object to the seizure of cash, demonstrates that the Penningtons voluntarily consented to the search for firearms and ammunition.

The court finds that Johnny did tell the officers that they were free to search his residence for firearms. Given the totality of the circumstances, the court finds that his consent was given voluntarily, unequivocally, and intelligently. While the court does not approve of the officers' decision to conduct the search at 2:00 a.m. despite the absence of any exigent circumstances, there is no evidence that the time of the search affected the coercive nature of the encounter or the voluntariness of Johnny's consent; Johnny was sufficiently alert to obtain a firearm before proceeding to the door, to attempt to hide it when he learned officers were at the door, and to later invoke his right to counsel, and there is no evidence that the officers acted forcefully in entering the home. Therefore, the court concludes that, even if the officers had not relied in good faith on the warrant signed by Judge Proffitt in executing the search, Johnny explicitly and voluntarily granted them permission to search his home for firearms, and suppression of the evidence seized during that search is therefore not warranted.

The fact that the officers informed Johnny that they had a warrant after he gave consent does not vitiate the consent. Although consent given *after* illegal police conduct is generally invalid, where the illegality – here, reliance on an invalid warrant – occurs after consent has been voluntarily given, the unlawful activity does not automatically revoke the consent. *United States v. Kelly,* 913 F.2d 261, 265-66 (6th Cir. 1990). That the warrant was not supported by probable cause does not affect the analysis, because the officers possessed enough information to obtain a valid warrant. *See United States v. Salvo,* 133 F.3d 943, 954-55 (6th Cir. 1998) (statements that officer will obtain a warrant if defendant does not consent does not taint subsequent consent if statements are not baseless or pretextual).

The Court in *Kelly* recognized that "an unlawful search and arrest ... could in principle diminish a defendant's ardor for revoking his consent," but found the record insufficient to show such an effect. *Id.* at 266. Similarly, the record here does not support the conclusion that the Penningtons declined to revoke their consent based on a belief that any attempt to do so would be futile in light of the officers' possession of a warrant. The fact that the Penningtons deny that Johnny consented to the search renders an argument that they would have revoked consent implausible and disingenuous. Furthermore, there is no dispute that Tena led the officers to the firearms and opened the safes so that they could seize the weapons. Although she questioned their authority and protested the officers' taking the money, her objections do not demonstrate a revocation of consent,

particularly in light of her assistance with regard to the firearms.

Although the court finds that the search was validated by Johnny's consent, the court nonetheless notes that it does not rely on the consent analysis in upholding the validity of the search and seizure. The court includes the consent analysis only in order to address the motion fully.[12]

D. Plain View/Protective Sweep

The government contends that, even if the warrant was invalid and was not relied upon in good faith in conducting the search, and even if Johnny did not give valid consent to the search, the search is nonetheless valid under the "plain view" doctrine and the rule allowing officers to perform a protective sweep of the premises after a valid arrest. The government argues that the officers were legally present at the Pennington home, they observed Johnny in possession of a weapon – the illegality of which was immediately apparent given Johnny's felon status – in plain view, and they were therefore justified in seizing the gun Johnny was carrying, arresting Johnny, and performing a protective sweep of the home.

Having determined that the good-faith exception to the probable-cause requirement validates the officers' reliance on the warrant and that Johnny consented to the search of the residence, the court declines to address the government's "plain view" and "protective sweep" argument.

---

[12] *Georgia v. Randolph*, ___ U.S. ___, 126 S.Ct. 1515 (2006), submitted by the defendants as supplemental authority, adds nothing to this analysis because the court finds that the defendants consented to the search.

F. Remedy

The defendants contend that all of the evidence seized during the search of the Penningtons' residence must be suppressed as either unlawfully seized or as "fruit of the poisonous tree." The party moving to suppress evidence bears the burden of showing that it was illegally obtained. *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991). The "fruit of the poisonous tree" doctrine mandates "that evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed." *United States v. McClain,* 444 F.3d 556, 564 (6th Cir. 2005). As discussed above, the court finds that the search of the Penningtons' residence was lawful, and the officers' good-faith reliance on the validity of the warrant justifies the seizure of the firearms and ammunition that the defendants are seeking to suppress. The "fruit of the poisonous tree" doctrine is therefore inapplicable. As discussed above with reference to the Motion to Exclude, Tena's statements to the police were made voluntarily and accordingly need not be suppressed.

The court does recognize, however, that the search conducted went far beyond the effort to discover the items that were listed in the warrant – firearms, weapons, and ammunition.[13] The record indicates careful scrutiny of pill bottles, and the defendants claim that the police inspected business documents and

[13] As previously noted, the decision to seize more than $500,000 cash was not made pursuant to the warrant and is therefore irrelevant to this court's consideration of the officers' regard for the warrant's terms.

computer files. The court need not find whether the officers actually examined documents and files, however, because nothing was seized from those sources. Flagrant disregard for the terms of a search warrant may require suppression of all evidence seized, but only when the executing officers *actually seize* items outside the warrant's scope. *See United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir. 1988) (blanket suppression required "[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property")*; United States v. Henson,* 848 F.2d 1374, 1383 (6th Cir. 1988) ("A search does not become invalid merely because some items not covered by a warrant are seized."); *United States v. Wuagneux,* 683 F.2d 1343, 1354 (11th Cir. 1982) ("absent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized"); *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir. 1978) ("where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's terms"). The officers did not uncover or seize any extra-warrant evidence in the course of executing the warrant, and blanket suppression is therefore not required. Accordingly,

**IT IS ORDERED** that Johnny Pennington's motion to exclude or for separate trials (DE 41) is **DENIED**. The alternative motion for separate trials is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion to suppress (DE 42) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion to continue the trial of this matter (DE 82) is **DENIED.**

Signed on July 17, 2006.

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY